UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| DOUGLAS KULIS, et al., | ) | |
|---|---|---|
| Plaintiffs | ) | |
| v. | ) | |
| KATHERINE WINN, | ) | 2:18-cv-00158-JCN |
| Defendant | ) | |
| and | ) | |
| ORIN D. WINN, | ) | |
| Party-in-Interest/<br>Counterclaim Defendant | ) | |

## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

This matter involves a dispute regarding the future ownership of two parcels of land and the improvements thereon in Georgetown, Maine. Plaintiffs ask the Court to order Defendant, in her capacity as personal representative of the Estate of Elizabeth Hersant, to sell her interest in Lot 38 on Marrtown Road in Georgetown to Plaintiff Margaret Winn and sell her interest in Lot 39 on Marrtown Road to Plaintiff Douglas Kulis. Defendant seeks the equitable partition of Lot 38 and the statutory partition of Lot 39.[1]

---

[1] In their complaint, Plaintiffs assert claims for equitable partition of both properties pursuant to 14 M.R.S. § 6051. In her counterclaim, Defendant asserts a claim for the statutory partition of Lot 39 in accordance with 14 M.R.S. §§ 6501-6525 and a claim for the equitable partition of Lot 38. If the Court concludes that the statutory partition of Lot 39 is not warranted, Defendant requests the equitable partition of the lot.

The Court conducted a bench trial at which the parties presented the testimony of witnesses, including expert witnesses, and other evidence. Following the trial, the parties filed written argument.

**FINDINGS OF FACTS**

After consideration of the evidence presented at trial, the Court finds the following facts:

1. Lot 38 on Marrtown Road in Georgetown, Maine is a 4.1 acre parcel. Plaintiff Margaret Winn (Margaret) owns 25% of the lot, Party-in-Interest Orin Winn (Orin) owns 50% of the lot, and Defendant Katherine Winn (Katherine or Defendant) owns 25% of the lot as tenants in common.

2. Lot 39 is a 25-acre parcel on Marrtown Road. Plaintiff Douglas Kulis (Douglas) owns 75% of the lot and Katherine owns 25% of the lot as tenants in common.

3. Margaret and Orin are cousins. Margaret is Douglas' mother. Elizabeth Hersant (Elizabeth) was Margaret's sister. Katherine is Elizabeth's daughter. Elizabeth died on June 28, 2016.

4. The lots, which have frontage on the Kennebec River, were purchased in 1947 by Clifton Winn, Helen Winn, and Orin Winn (the father of the party-in-interest).

5. At the time of the purchase, there were two structures on Lot 38 – referred to as the big house and the little house (i.e., the old store). Practically, neither structure is habitable year-round.

6. Orin has exclusive use of and pays the taxes assessed on the big house. Until her death, Elizabeth had exclusive use of the little house.

7. In or about the 1950s, the owners of the property, in an effort to provide for the next generation, leased four sublots on Lot 38 to their children: Elizabeth, Margaret, Orin, and Douglas Winn (Orin's brother). Margaret was the only person to build a structure on her leased sublot.

8. The leases expire in 2044 or upon the death of the lessee. Because Elizabeth and Douglas Winn are deceased, only two leases remain on Lot 38.

9. There are no structures on Lot 39. Lot 39 has a rugged terrain and has been used for hunting and harvesting wood.

10. Lot 39 had been classified as tree growth for tax purposes, but was later changed to open space. As the result of the change from tree growth to open space, a tax penalty in excess of $40,000 is due if the property is sold.

11. Lot 39 is burdened by a well easement and a septic easement for Douglas' nearby property. The lot is also burdened by a well easement for Margaret's structure on Lot 38.

12. Defendant's expert (appraiser) witness, Jane Furbeck-Owen, assessed the value of Lot 38 between $725,000 and $750,000, and Lot 39 at between $325,000 and $350,000. Plaintiff's expert (appraiser) witness, Kenneth Charest, assessed the value of Lot 38 at $495,000, and Lot 39 at $100,000, after accounting for the $40,000 tax that would be due upon sale because the property had previously been

classified as tree growth. Katherine testified she believed the value of Lot 38 to be $825,000 and Lot 39 to be between $325,000 and $350,000.

13. According to Mr. Charest, while Lot 39 had frontage on the Kennebec River, because of the steep topography of the lot to the river, when valuing the property, it is appropriate to compare the property to sales of property with a water view. At least one of the comparable sales properties used by Mr. Charest in his appraisal included some water frontage. Lot 39 has approximately 600 feet of frontage on the Kennebec River. Mr. Charest did not believe it was necessary to limit the comparison to the sales of waterfront property because the frontage was "fairly poor and tough to access." Mr. Charest, however, did account for the water frontage to some degree when assessing the value of Lot 39.

14. Mr. Charest determined the best use of Lot 38 was as a family compound on an effective site of approximately two acres. The effective site was less than the total acreage of the lot because of topography and wetlands issues. Mr. Charest considered the Lot 38 water frontage to be tidal because it "flats out" at low tide. The lack of access to the water from the property when the area "flats out" decreases the value of the property.

15. Ms. Furbeck-Owen's appraisal business primarily consists of the appraisal of waterfront properties. In assessing Lot 39, Ms. Fubeck-Owen applied an adjustment of $25,000 to account for the change of the lot's classification from tree growth to open space. Ms. Furbeck-Owen determined that the highest and best use for Lot 39

4

was for future development of an estate property that because of its size could support a primary dwelling. She also placed value on the privacy associated with 25 acres of land.

16. In her assessment of Lot 39, Ms. Furbeck-Owen used sales of properties with water frontage. On average, the properties used by Ms. Furbeck-Owen as comparable sales for Lot 39 were closer in proximity to Georgetown than the properties used by Mr. Charest.

17. In her assessment of the value of Lot 38, Ms. Furbeck-Owen used the four comparable sales that Mr. Charest used and two other comparable sales. Ms. Furbeck-Owen made different adjustments than Mr. Charest based on the amount and type of water frontage, the recreational utility and actual views. Although Ms. Furbeck-Owen accounted for the leases on Lot 38 in terms of the privacy interest of a potential buyer, she did not otherwise account directly for the likely length of the leases and the impact of the burden on the potential sale price of Lot 38. Ms. Fureck-Owen did not consider the Lot 38 water frontage to be tidal because a dock (pier) could be constructed to allow access to the water in low tide.

18. Given the topography of Lot 39, the area for access to and construction of improvements on the property is very limited, and the access to the water frontage is challenging.

19. According to Defendant's expert (surveyor) witness, John Wood, Lot 39 could be physically divided. Mr. Wood did not provide a basis for his opinion, nor did he determine whether Lot 39 was buildable if it were divided.

20. In the years following Elizabeth's death, Margaret has paid the taxes and insurance on the little house on Lot 38.

21. In 2010, an individual who owns abutting property purchased nearby "back property" for $7,500 per acre.

22. Margaret has the ability to purchase Defendant's interest in Lot 38 as assessed by Mr. Charest. Douglas has the ability to purchase Defendant's interest in Lot 39 as assessed by Mr. Charest.

23. Defendant does not have the ability to purchase the interests of Margaret in Lot 38, nor Douglas in Lot 39, regardless of whether the Mr. Charest's valuation or Ms. Furbeck-Owen's valuation of the properties is used.

**CONCLUSIONS OF LAW**

In this diversity action, Maine substantive law applies. *Alejandro-Ortiz v. Puerto Rico Elec. Power Authority*, 756 F.3d 23, 26 (1st Cir. 2014). In *Libby v. Lorrain*, 430 A.2d 37, 39-40 (Me. 1981), the Maine Law Court explained the law of partition in Maine as follows:

> Our present statutes preserve the statutory remedy of "partition by petition" that was made available as a simpler alternative to the ancient writ of partition to joint tenants and tenants in common immediately after Maine achieved statehood. Statutory partition may be carried out only by physical division of the jointly owned real estate or perhaps . . . by a time-sharing of

> its use. Furthermore, statutory partition is subject to specially prescribed procedural rules, providing, for example, an interlocutory order entered on a jury's verdict, if a jury is demanded that identifies the parties' interests to be set off and appoints commissioners to divide the real estate physically into specified shares. Partition is also available to joint owners of real estate through the equity jurisdiction of the Superior Court. . . Equitable partition is more flexible in its procedure than "partition by petition" and is not limited to a physical division and may be carried out by sale, as statutory partition may not be, and it is free of any special and restrictive procedures laid down by statute.

*Id.* (citations omitted).

**A.   Statutory Partition**

Defendant asks the Court to divide Lot 39 physically – to grant her 25% of the property and grant Douglas 75% of the property. The division of Lot 39, however, with its steep, rugged topography and limited means of access, is not practical and would materially impair the parties' interests in the property. Indeed, other than the bald assertion of Defendant's expert, John Wood, that the property was capable of division, the record lacks any evidence that a physical division is feasible or practical. In addition, the record does not include a plan for division or evidence that a physical division of the property in accordance with the parties' interests could be accomplished within the applicable state and local laws and ordinances.

Furthermore, the persuasive evidence established that the value of Lot 39, and thus the parties' interests, would be impaired if a physical division were feasible and ordered. Mr. Charest, Plaintiffs' expert appraiser, and Ms. Furbeck-Owen, Defendant's expert appraiser, agree that while future development of the property in the highest and best use

of the Lot 39, the buildable area of the property is limited; the record contains no persuasive evidence that the property consists of more than one buildable lot. A physical division of the property would thus materially injure the rights of the parties insofar as one party would receive a buildable lot and the other would receive a parcel that is not buildable. The party receiving the non-buildable lot would receive less value and would have fewer options for the property's use.

The location of key features would also complicate efforts to divide the property physically. The parcel is oblong, with road access to the south and southwest, water access at the northwest corner, and the flattest areas most likely to support development are in the northeast and the southern portions. The configuration of the property makes it impractical to create two parcels with proportionate road access, water access, and potential for future development. *See Williams v. Coombs*, 88 Me. 183, 33 A. 1073, 1074 (1895) ("It is the opinion of the court, therefore, that this property could not be divided without greatly impairing its value" and concluding, therefore, that an equitable partition "would be much more beneficial to both parties").

In short, the statutory partition of Lot 39 would materially injure the parties' rights and is otherwise impractical.

**B.  Equitable Partition**

All parties seek the equitable partition of Lot 38. Plaintiff Douglas Kulis and, in the alternative if the Court denied her request for the physical partition of Lot 39, Defendant

also asks for the equitable partition of Lot 39. The parties, however, disagree as to the value of the lots and thus what would constitute an equitable partition of the properties.

"The trial court's equity power is broad and flexible," and is within the trial court's discretion. *Withee v. Garnett*, 1998 ME 30, ¶ 4, 705 A.2d 1119, 1120. Maine courts exercising their equitable powers ordinarily partition jointly owned property by ordering the property sold and the proceeds divided, by assigning the property to one party with the requirement that they pay a sum of money to compensate the other, or by some contingent combination of those options. *See Hutz v. Alden*, 2011 ME 27, ¶¶ 13 – 14, 12 A.3d 1174, 1178; *Whittet v Whittet*, No. RE-11-26, 2013 WL 8114512, at *4 (Me.Super. Sep. 26, 2013). Courts must examine "all . . . relevant equitable considerations" and factors, including but not limited to the length of occupancy, the efforts expended on the property, the expenses and delay of selling to a third-party, and the financial capacities of the parties. *Libby*, 430 A.2d at 40; *Ackerman v. Hojnowski*, 2002 ME 147, ¶ 20, 804 A.2d 412, 417 – 18; *Wicks v. Conroy*, 2013 ME 84, ¶ 19, 77 A.3d 479, 484.

If the chosen method of equitable partition requires a court to assign a value to the property, "[t]he court is not required to accept an appraiser's valuation . . . and its decision to do so must be based upon a determination of the appraiser's credibility and the weight given that opinion." *Hutz*, 2011 ME ¶ 14, 12 A.3d at 1178. When there is a disagreement as to value of jointly owned property, "a mere averaging of two appraisals may not be acceptable" but "any estimate that is within the range of expert opinion is valid provided the [judge] reached his [or her] own conclusion through an independent review of the

evidence." *Shirley v. Shirley*, 482 A.2d 845, 849 (Me. 1984); *see also Curtis v. Weston*, 1997 ME 28, ¶ 2, 690 A.2d 969, 970 ("the court was not compelled to choose either of the appraisals of the property, but properly determined its value within the range of the evidence").

Here, the balance of all the equities favors a partition by assignment, or buy-out, over the other options. A sale of either or both properties would result in a further delay in the resolution of the property's ownership, an increase in administrative costs, and would risk forced divestiture of the family property. *See* Zachary D. Kuperman, *Cutting the Baby in Half: an Economic Critique of Indivisible Resource Partition*, 77 Brook. L. Rev. 263, 290 – 93 (2011) (noting that a significant number of states explicitly or in practice prefer buy-outs, citing *Dyer v. Lowell*, 30 Me. 217, 219 (1849) ("If the estate was incapable of division, they should have set off the whole to one of the co-tenants") and *Wilk v. Wilk*, 795 A.2d 1191, 1196 (Vt. 2002) (explaining that "[f]orced sale is disfavored because the Legislature, and the common law that came before, sought to minimize the forced divestiture of family property where avoidable")). In these circumstances, "there [is] much to impel the . . . court to" order a buy-out. *Libby*, 430 A.2d at 40.

The Court is also convinced that the buy-out should occur through Plaintiffs' purchase of Defendant's interest in both lots. Plaintiffs have strong connections to, lengthy histories with, and recent consistent use of the properties; Plaintiffs also have the financial ability to purchase Defendant's interest. Defendant has not demonstrated that she would

make as much use of the properties as Plaintiffs and has not established that she has the financial ability to purchase Plaintiffs' interests.

### 1. Valuation of Lot 39

The parties' expert appraisers differ significantly regarding the value of Lot 39. The difference is primarily based on (a) the sales the appraisers used as comparable sales to establish the value of the property and (b) the significance the appraisers placed on the property's 660 feet of frontage on the Kennebec River.

While both appraisers presented as experienced and qualified to opine on the value of Lot 39, they clearly viewed the property differently. Both determined that the highest and best use of the property was future development. As discussed above, however, for various reasons (e.g., slope of the property, means of access), the buildable area is limited. While Mr. Charest's assessment process and general analysis appear to be sound, his assessment is not entirely reasonable. In addition, the Court is not convinced that Ms. Furbeck-Owen's valuation of the property, based in part on her view that the property was suitable for a personal estate, with multiple structures, is supported by credible evidence of record.[2]

---

[2] In support of her assessment of Lot 39, Ms. Furbeck-Owen testified in part:

> The highest and best use of Lot 39, it is a significant amount of acreage. There isn't a significant amount of demand for a subdivision in that area of Georgetown at this point in time, but there is much more of a demand for – there is still a strong demand for residential waterfront estate properties because of the potential views that you – and the privacy associated with owning 25 acres of land, and being directly to the south of a multi million dollar parcel.

(Trial Tr. at 318.)

One area of disagreement is the significance of the water frontage. Mr. Charest considered the water frontage to a degree, but primarily considered the property to be water view.[3] In his report that he referenced during his testimony, Mr. Charest adjusted the comparable sales prices by a factor of between .10 and .25 for "Kennebec River views." The portion of the report he referenced does not include an adjustment based on the comparison of the water frontage. In fact, two of the four parcels used as comparable sales do not include any water frontage and one had 50 feet of water frontage.[4] He testified that on the two comparable sales with water frontage, he made a .25 adjustment for the superior frontage of Lot 39. The record reflects he also made a .25 adjustment to one parcel without water frontage and a .10 adjustment to the other parcel without water frontage. A mere adjustment of .25 to the value of a comparable sale that does not include any water frontage and to a property that includes 16% of the frontage (i.e., 50 feet) of the frontage of Lot 39 does not appear reasonable. Particularly given the determination that division of the property is impractical and thus the property will remain as one parcel, some water access is available and meaningful. Ms. Furbeck-Owen's testimony that the water frontage was undervalued in Mr. Charest's opinion thus has merit.

---

[3] In his report that he referenced during his testimony, Mr. Charest adjusted the comparable sales prices by a factor of between .10 and .25 for "Kennebec River views." The portion of the report he referenced does not include an adjustment based on the comparison of the water frontage. He testified that on the two comparable sales with water frontage, he made a .25 adjustment for the superior frontage of Lot 39. (Trial Tr. 169-170).

[4] The fourth parcel listed 500 feet of water frontage.

The issue is the appropriate value of the property given the concerns raised about the appraisals of both experts. Here, the range of evidence of value[5] is between Mr. Charest's assessment of $100,000 and Ms. Furbeck-Owen's assessment of $325,000 to $350,000.[6] Other than Mr. Charest's assessment of the water frontage, his approach and appraisal are sound. Mr. Charest's assessment can reasonably serve as a baseline for the Court's assessment.

After reviewing the comparable sales, Mr. Charest assessed the value of Lot 39 at $5,600 per acre.[7] His assessment, however, was based on comparable sales that he only adjusted by .25 for the water frontage. The Court is convinced that the water frontage is accessible and available for use and thus the property should be assessed as water frontage property. The comparable sales thus should be adjusted further. After considering Ms. Furbeck-Owen's testimony about comparable sales with water frontage that Mr. Charest did not include, together with Mr. Charest's valuation, the Court assesses the value of Lot 39 at $190,000.[8] The value of Defendant's 25% interest in Lot 39, therefore, is $47,500.

---

[5] *See Curtis*, 1997 ME 28, ¶ 2, 690 A.2d at 970 ("the court was not compelled to choose either of the appraisals of the property, but properly determined its value within the range of the evidence").

[6] The Court also considered circumstantial evidence of the town's assessed value for tax purposes and Defendant's own estimate of the property values but gives the evidence little weight.

[7] Mr. Charest assessed the value at $140,000, which when divided by the 25 acres results in a per acre value of $5,600. He confirmed the per acre assessment at trial.

[8] While the Court did not rely exclusively on the 2010 sale of similar property in the immediate vicinity sale, the Court's assessment is consistent with the sale. A neighbor who owns property abutting the northern boundary of Lot 39, purchased land nearby in 2010 for $7,500 per acre. Plaintiff argues that the Court should not consider that purchase because a neighboring landowner does not necessarily represent a typical buyer. The Court is not persuaded that the sale is irrelevant, however, because (1) the record lacks any evidence to support a conclusion that the sale did not reflect market value in 2010, and (2) any premium

## 2. Valuation of Lot 38

The parties' appraisers also differed as to the value of Lot 38. The appraisers, however, used four of the same comparable sales in their respective assessments. The range of value for Lot 38 is from Mr. Charest's valuation of $495,000 to Ms. Furbeck-Owen's valuation of $725,000 to $750,000.

Ms. Furbeck-Owen placed greater value on the water frontage as she did not consider the property to be tidal. Ms. Furbeck-Owen's determination that the property was not tidal because a dock could be constructed to permit access to the water in low tide is unpersuasive. The water frontage "flats out" even beyond the current dock. Under the circumstances, Mr. Charest's characterization of the frontage as tidal is more appropriate.

The two appraisers also differ markedly on their assumptions regarding the leases. Ms. Furbeck-Owen did not consider the existence of the two leases to have a significant impact on the value of the property. Defendant, in fact, questions the validity of the leases at their inception in 1964, the validity of the lease extensions in 1997, and the continued survival of the leases after Margaret, Elizabeth, and Orin became owners of the fee interest. Mr. Charest, in contrast, assumed the leases are valid and thus not part of the commonly

---

the neighbor might have paid is presumably mitigated to some degree by the rate of inflation generally and in the local real estate market since 2010. Furthermore, although the Court has considered the potential tax due as the result of the removal of the property from the tree growth classification, the Court is not convinced that a reduction in the market value as part of an equitable partition is appropriate insofar as the record lacks any evidence to suggest that tax would be due if Defendant simply sells her interest in the property to Plaintiff Douglas Kulis. Given Plaintiff Douglas Kulis' stated desire to acquire the property to maintain the property in his family with its current use, the Court cannot conclude the tax is likely to be due and paid in the foreseeable future.

owned property. He subtracted the two remaining leased lots from the acreage and did not assign any value to the structure Margaret built on the lot leased to her.

Given the circumstantial evidence of the leases, including the existence (if not the continued existence) of writings that would satisfy the statute of frauds and given the parties' historical recognition of the leases, the leases must be considered to some degree in the valuation of the property.[9] Neither appraiser's approach to the leases, however, adequately addresses the impact of the leases on the value of the property.

Ms. Furbeck-Owen did not meaningfully account for the impact of the leases. The existence of the leases or, at a minimum, the prospect of legal proceedings regarding the validity of the leases, would undoubtedly adversely impact the value of the property to an

---

[9] Defendant points out that there is no copy of Orin's lease in the record, that Margaret's 1964 lease document is not signed by her, that there is no actual copy of a separate signed writing extending the leases from 2004 to 2044 – only a notice recorded with the county that the parties had agreed to extend the leases. Defendant contends that if there were any valid leases, they merged with the fee interest at some point between 1999 and 2004 when Elizabeth, Margaret, and Orin became owners in addition to leaseholders.

According to the doctrine of merger, "[w]henever a greater and a less estate" are both owned at the same time by the same entity, "the less is immediately merged in the greater, and thus annihilated." *Nature of Merger Generally*, 31 C.J.S. Estates §§ 153 *et seq*. There is a split of authority concerning the merger rule as applied to a leaseholder who subsequently takes a fee interest in common with others. *Compare Clayton v. Clayton*, 75 So. 3d 649, 654 (Ala. Civ. App. 2011) (a merger occurs when a lone tenant under a lease acquires ownership of the freehold estate as a joint tenant with another because a joint tenant "is considered to own an undivided interest in the whole property"); *with Hurley v. A'Hearn*, 157 N.E.2d 223, 224 (Mass. 1959) ("the acquisition of an undivided one-half interest by one who held a lease of the premises did not effect a merger" because "[t]here is nothing to indicate that the mother in devising to [the leaseholder] a half interest in the property intended that [the leaseholder] should not continue to hold as lessee under the lease"). Although there is limited authority on point, the Maine Law Court declined to find a merger in the related context of easements when the greater estate was owned jointly by others. *See Dority v. Dunning*, 78 Me. 381, 6 A. 6, 9 (1886) ("the ownership of the two estates should be co-extensive . . . If one is held in severalty, and the other only as to a fractional part thereof, by the same person, there will be no extinguishment of such easement"). Whether similar reasoning would control under the present facts is uncertain. The Court, however, is not required to decide whether the interests merged in order to resolve all issues among the joint owners with an ordered buy-out of an owner without a leasehold interest.

15

ordinary prospective buyer. That is, regardless of the ultimate legal status of the leases, the existence of the leases and the existence of a structure on one of the leased premises would affect the value of the property to a greater degree than Ms. Furbeck-Owen assigned. Furthermore, the value assigned by Ms. Furbeck-Owen to the structure on Margaret's leased parcel ($125,000) does not appear to be reasonable. Based on the photographs and the witnesses' description of the structure, the assigned value of the structure appears high.

In his assessment, Mr. Charest used appropriate comparable sales and made supportable adjustments for differences in acreage, the quality of the structures, and the topography and nature of the waterfront. Mr. Charest's opinion of the value of Lot 38 serves as a useful baseline for the Court. Mr. Charest, however, included too great a discount for the leasehold interests. First, any challenge to the validity of the leasehold interests would present a legitimate issue and a court could conceivably find the leases to be invalid or that the leases merged with the fee interests of Margaret and Orin Winn. In addition, even if valid, the leasehold interests will terminate either upon expiration of the lease terms or the deaths of the lessees. Under the circumstances, to remove the leased property from the amount of acreage considered and not give any value to the property would be unreasonable as a prospective buyer would undoubtedly consider the realistic duration of the leasehold interests.

The two appraisers also disagree as to the propriety of subtracting another acre from the parcel's effective size for wetland or other areas that are less usable. Ms. Furbeck-

16

Owen credibly disputed Mr. Charest's reduction in effective size for this acre, as she testified that many of the comparable properties had similar features.

Consistent with the method Mr. Charest used to adjust the comparable sales with different acreages and building sizes, the Court affords some value for the leased property and the areas that are less usable due to the wetlands issue, and adjusts upward Mr. Charest's assessed value. [10] The Court concludes that an increase in Mr. Charest's appraised value in the amount of $75,000 is appropriate and thus assesses the overall value of Lot 38 at $570,000. The value of Defendant's 25% interest in Lot 38, therefore, is $142,500.

## CONCLUSION

Based on the foregoing findings and analysis, the Court enters judgment as follows:

1. On Defendant's claim for the statutory partition of Lot 39 (Count III of the Counterclaim), judgment is entered against Defendant and in favor of Plaintiff Douglas Kulis.

---

[10] As with the approximately one acre of remaining leased lots, the parties dispute whether the structure on Margaret's lot has been sufficiently affixed to the land to make it part of the jointly owned real estate, or whether it is entirely Margaret's property. If the leases were originally invalid or later merged, there is a corresponding likelihood that the structure was always part of the common property or became part of that common property. If the leases were originally valid and remain enforceable, the structure presumably would be removed when the lease terminates and would not provide any value to the common property. Given the practicalities of the situation and given the Court's chosen equitable remedy, the Court resolves the ambiguity regarding the structure by including an upward adjustment comparable to those Mr. Charest made for the additional square footage of the structure, discounted for the uncertainty concerning the leases. The net result is a modest increase in the Court's assessed value of Lot 38 for the structure, which increase is incorporated in the Court's ultimate determination of the value of Lot 38.

2. On Plaintiff Douglas Kulis' and Defendant's claim for the equitable partition of Lot 39 (Count I of the Petition and Count IV of the Counterclaim), judgment is entered in favor of Plaintiff Douglas Kulis and against Defendant. Within 60 days of the date of this judgment, in consideration of the payment by Plaintiff Douglas Kulis of $47,500, Defendant shall convey all her interest in Lot 39 to Plaintiff Douglas Kulis. [11]

3. On the claims of Plaintiff Margaret Winn and Defendant for the equitable partition of Lot 38 (Count II of the Petition and Count II of the Counterclaim), judgment shall be entered in favor of Plaintiff Margaret Winn.[12] Within 60 days of the date of this judgment, in consideration of the payment by Plaintiff Margaret Winn of $142,500, Defendant shall convey all her interest in Lot 38 to Plaintiff Margaret Winn.

**SO ORDERED.**

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 19th day of September, 2019.

---

[11] Because Plaintiffs have effectively had full access and control of the common property following Elizabeth's death, and because Defendant had limited access to the properties after the parties' dispute arose, the Court does not believe the balance of the equities require a reduction in the payment to account for back taxes, insurance, or other costs claimed by Plaintiffs. *See Palanza v. Lufkin*, 2002 ME 143, ¶ 14, 804 A.2d 1141, 1145, *modified on other grounds by Wicks v. Conroy*, 2013 ME 84, ¶ 14, 77 A.3d 479 ("A co-owner's exclusive use of jointly held property is a factor offsetting his expenditures on the property").

[12] At trial, Defendant voluntarily dismissed her claim for statutory partition of Lot 38, Count I of the Counterclaim. (Oral Voluntary Dismissal, ECF No. 49.)